# 24-2962

# United States Court of Appeals
# for the Second Circuit

AMIRKHANOV YERKYN,

*Plaintiff-Appellant,*

-against-

KLEBANOV ALEXANDR YAKOVLEVICH, KAN SERGEY
VLADIMIROVICH, NATIONAL SECURITY COMMITTEE OF
THE REPUBLIC OF KAZAKHSTAN,

*Defendant-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT,
EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT

IRINA SHPIGEL
SHPIGEL LAW P.C.
*Attorneys for Plaintiff-Appellant*
1599 East 15th Street, 5th Floor
Brooklyn, New York 11230
(212) 390-1913
ishpigel@iselaw.com

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ......................................................1

ISSUES PRESENTED.........................................................................1

      (1) DOES APPELLANT'S PROPOSED AMENDED COMPLAINT
      ALLEGATIONS REGARDING DOMESTIC INJURY, INCLUDING THE
      LOSS OF ACTIONABLE U.S. CLAIMS AND MEASURABLE
      ECONOMIC HARM CAUSED BY DEFENDANTAPPELLEES' MISUSE
      OF U.S.-BASED FINANCIAL SYSTEMS, ESTABLISH THE REQUIRED
      DOMESTIC INJURY UNDER RICO? ......................................................2
      (2) DID THE COURT IMPROPERLY OVERLOOK THE COERCIVE
      WAIVER UNDER ALLEGED TORTURE, WHICH DEPRIVED
      PLAINTIFF OF LEGAL RECOURSE AGAINST U.S. ENTITIES, AS A
      DISTINCT INJURY WITHIN U.S. JURISDICTION?..................................2
      (3) DID THE DISTRICT COURT ERR BY MINIMIZING KEY FACTS
      CONNECTING PLAINTIFF'S INJURIES TO U.S. JURISDICTION,
      LEADING TO DISMISSAL FOR LACK OF SUBJECT MATTER
      JURISDICTION? ...................................................................................2

STATEMENT OF THE CASE................................................................2

SUMMARY OF THE ARGUMENT .....................................................12

STANDARD OF REVIEW ARGUMENT ............................................13

   I.    YERKYN AMIRKHANOV ADEQUATELY PLEADED A
       DOMESTIC INJURY IN THE PROPOSED SECOND
       AMENDED COMPLAINT................................................................14
   II.   THE RIGHT TO SUE IS A COGNIZABLE INJURY TO
       PROPERTY.....................................................................................18
   III.  THE DISTRICT COURT ERRED BY DENYING YERKYN
       AMIRKHANOV'S MOTION TO AMEND..........................................19
   IV.  THE PLAINTIFF-APPELLANT ALLEGED A DOMESTIC INJURY
       RESULTED IN CONCRETE FINANCIAL LOSS................................23

i

CONCLUSION ................................................................................................... 24

CERTFICATE OF COMPLIANCE ................................................................... 25

## TABLE OF AUTHORITIES

*Page(s)*

**Cases:**

*Bascuñán v. Elsaca*,
    874 F.3d 806 ...................................................................................20, 22

*Canyon County v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008) ...........................................................18

*Carter v. Healthport Techs., LLC*,
    822 F.3d 47 (2d Cir. 2016) ...............................................................13

*Dennis v. JPMorgan Chase & Co.*,
    343 F. Supp. 3d 122 ...........................................................................20

*Diaz v. Gates*,
    420 F.3d 897 (9th Cir. 2005) ...........................................................18

*Enron Oil Corp. v. Diakuhara*,
    10 F.3d 90 (2d Cir. 1993) ...................................................................5

*Gelboim v. Bank of am. Corp.*,
    823 F.3d 759 (2d Cir. 2016) ...........................................................14

*Hammond v. Carthage Sulphite Pulp Paper Co.*,
    8 F.2d 35 (2d Cir. 1925) ...................................................................19

*In re Alstom SA Securities Litigation*,
    406 F. Supp. 2d 346 ...........................................................................20

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013) ...............15

*Klein*,
    906 f.3d at 226 ...................................................................................14

*Kropelnicki v. Siegel*,
    290 F.3d 118 (2d Cir. 2002) ........................................................................14

*Krys v. Pigott*,
    749 F.3d 117 (2d Cir. 2014) ...............................................................13, 14

*Logan v. Zimmerman Brush Co.*,
    455 U.S. 422 (1982)....................................................................................19

*Microsoft Corp. v. AT&T Corp.*,
    550 U.S. 437, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007) ...............................15

*Morris v. New York City Employees' Retirement System*,
    129 F. Supp. 2d 599 ...................................................................................19

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) ........................15, 17

*Nestlé USA, Inc. v. Doe*,
    593 U.S. —, —, 141 S.Ct. 1931, 210 L.Ed.2d 207 (2021) ..........................16

*Planters' Bank v. Sharp*,
    47 U.S. 301 (1848)......................................................................................19

*RJR Nabisco, Inc. v. European Community*,
    579 U.S. 325, 136 S.Ct. 2090, 195 L.Ed.2d 476 (2016) ............14, 15, 16, 17

*Smagin v. Yegiazaryan*,
    37 F.4th 562 (9th Cir. 2022) ......................................................................18

*Sprint Communications Co. v. APCC Services, Inc.*,
    554 U.S. 269 (2008)....................................................................................19

*Tabor v. Bodisen Biotech, Inc.*,
    581 F. Supp. 2d 552 ...................................................................................21

*The History of the Treatment of Choses in Action by the Common Law*,
    33 HARV. L. REV. 997 (1920).......................................................................3

*Yegiazaryan v. Smagin*,
599 U.S. —, 143 S.Ct. 1900 (2023) ...................................................14, 17, 20

*Walden v. Fiore*,
571 U.S. 277 (2014) .............................................................................................24

*WesternGeco LLC v. ION Geophysical Corp.*,
585 U.S. —, —, 138 S.Ct. 2129, 201 L.Ed.2d 584 (2018) ...........................16

**Rules, Laws & Statutes:**

18 U.S.C. § 1961 ....................................................................................................1

18 U.S.C. § 1962(c) ...............................................................................................6

18 U.S.C. § 1964(c) ...........................................................................1, 17, 18, 20

18 U.S.C. § 1964(d) ...............................................................................................6

28 U.S.C. § 1291 ....................................................................................................1

28 U.S.C. § 1331 ....................................................................................................1

28 U.S.C. § 1350 ....................................................................................................6

28 U.S.C. § 1602 ....................................................................................................4

Alien Tort Statute ("ATS") ...................................................................................6

Federal Rule of Civil Procedure 12(b)(1) ...............................1, 3, 4, 5, 13

Federal Rule of Civil Procedure 12(b)(2) ...........................................1, 4, 5

Federal Rule of Civil Procedure 12(b)(5) ..............................................1, 4

Federal Rule of Civil Procedure 12(b)(6) ...............................................12

Foreign Sovereign Immunities Act ...................................................................4, 5

JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C § 1291 as this appeal arises from a final decision of the district court dismissing Appellant's claims against all Defendant-Appellees. The district court order being appealed from was entered on September 30, 2024. *See* A-011[1].  Appellant filed a notice of appeal on October 29, 2024. *See* A-009-010. The district court had original jurisdiction over this case pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.

ISSUES PRESENTED

This is an appeal from an order dismissing all of Plaintiff-Appellant's claims against the Defendant-Appellees under Rule 12(b)(1)-(2), (5), and denying Plaintiff-Appellant's Motion to Amend his Complaint.  The district court concluded that the Proposed Second Amended Complaint was futile because, according to the court,

---

[1] Reference to the Appendix are designated "A-____." The Proposed Second Amended Complaint, at A-021 to A-063, is referenced as "PSAC."

Appellant did not adequately allege a domestic injury to support his RICO claims. The issues before the Court are as follows:

(1) Does Appellant's Proposed Amended Complaint allegations regarding domestic injury, including the loss of actionable U.S. claims and measurable economic harm caused by Defendant-Appellees' misuse of U.S.-based financial systems, establish the required domestic injury under RICO?

(2) Did the Court improperly overlook the coercive waiver under alleged torture, which deprived Plaintiff of legal recourse against U.S. entities, as a distinct injury within U.S. jurisdiction?

(3) Did the District Court err by minimizing key facts connecting Plaintiff's injuries to U.S. jurisdiction, leading to dismissal for lack of subject matter jurisdiction?

STATEMENT OF THE CASE

Plaintiff-Appellant's claims center on a conspiracy by Defendant-Appellees to *inter alia* unlawfully strip him of his right to pursue legal redress against U.S.-based Forte Marketing LLC and related entities, resulting in substantial, tangible harm within the United States. By obstructing Plaintiff-Appellant's ability to assert legitimate claims in the U.S. against Forte Marketing and other U.S. entities,

2

Defendant-Appellees have inflicted a direct and concrete domestic injury tied to his lost legal recourse and economic interests under U.S. jurisdiction.

The United States District Court (Hon. LASHANN DEARCY HALL) denied Appellant's motion to amend his first amended complaint and granted Defendant-Appellees' motion to dismiss the first amended complaint without prejudice to renew. *See* A- 011. In reaching its decision to dismiss Appellant's claims, the court concluded it lacked subject matter jurisdiction, leading to dismissal of the case under Federal Rule of Civil Procedure 12(b)(1). *See* A-012 to A-020.

Procedural History

On March 28, 2023, Plaintiff-Appellant filed a *pro se* complaint against Defendants-Appellees Klebanov Alexandr Yakovlevich, Kan Sergey Vladimirovich, and the National Security Committee of Kazakhstan ("NSC"). See A-064 to 084. Plaintiff-Appellant subsequently filed a pro se First Amended Complaint on April 21, 2023. *See* A-085 to A-191.

In both complaints, Plaintiff-Appellant alleged that Defendants-Appellees, Alexander Yakovlevich Klebanov ("Klebanov") and Sergey Vladimirovich Kan ("Kan"), orchestrated a conspiracy to deprive him of his property rights[2]. *See* A-089.

---

2 Plaintiff-Appellant, through counsel, subsequently sought leave to amend the complaint to enhance the pleadings and specify the jurisdictional location of the property he was coerced into relinquishing which included causes of action against U.S. entities. This amendment was

Amid Eximbank's impending insolvency, caused by Klebanov and Kan's fraudulent activities, Plaintiff-Appellant, Yerkyn Amirkhanov, was arrested by the NSC and subjected to torture under the direction of Klebanov and Kan in Kazakhstan. *See* A-089, A-093. During his detention, Plaintiff-Appellant was coerced into signing agreements that stripped him of valuable CAPEC shares, forced him to assume Eximbank's debts, and compelled him to waive all legal claims against Defendants-Appellees and their affiliated entities. *See* A-104 to 108.

On November 17, 2023, Defendants-Appellees filed an omnibus motion to dismiss the First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), (5), and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq. See A-208. Under the Court's Scheduling Order, Plaintiff-Appellant's opposition to the motion was due on October 20, 2023, with the fully briefed motion deadline set for November 17, 2023. *See* A-206.

Before the opposition deadline, Plaintiff-Appellant sought an extension to secure counsel and effectively respond to the motion. *See* A-210. However, the Court did not respond to this request. On November 17, 2023, Defendants-Appellees served and filed their motion to dismiss, arguing for dismissal based on lack of

---

intended to provide greater clarity and address any jurisdictional concerns raised by Defendants-Appellees.

subject matter and personal jurisdiction under Rules 12(b)(1), (2), and the Foreign Sovereign Immunities Act. *See* A-212.

On the same day, Plaintiff-Appellant's retained counsel, filed a notice of appearance and requested leave to file a pre-motion letter seeking to amend the First Amended Complaint ("FAC"). *See* A-223. On November 24, 2023, Plaintiff-Appellant, through counsel, submitted a pre-motion letter seeking leave to amend the FAC under Rule 15(b). Plaintiff-Appellant argued that, as a pro se litigant when initiating the action, he should be granted flexibility to amend the complaint to address issues raised in Defendants-Appellees' motion to dismiss. Citing *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90 (2d Cir. 1993), Plaintiff-Appellant emphasized the need to afford pro se litigants greater leniency in procedural matters.

On December 1, 2023, the Court granted Plaintiff-Appellant's request to file a motion to amend and issued a Scheduling Order setting February 9, 2024, as the deadline for the fully briefed motion. See A-22. Following a subsequent extension request, the Court adjusted the deadline to February 23, 2024. *See* A-228.

On February 21, 2024, Plaintiff-Appellant requested an additional two-week extension to file the motion by March 8, 2024. See A-229. The Court did not respond to this request and the fully briefed motion amend the FAC was filed on February 28, 2024. *See* A-230.

The Plaintiff-Appellant's Proposed Second Amended Complaint ("PSAC") alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and § 1964(d), the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, as well as state law claims of unjust enrichment and conversion.

Through the PSAC, Plaintiff-Appellant sought to amend the First Amended Complaint ("FAC") by enhancing the pleadings and clearly identifying the location of the specific property at issue. The proposed amendments also specified the entities within the United States against which Plaintiff-Appellant was coerced into forfeiting legal claims. *See generally* A-021 to A-063.

On September 30, 2024 the district court granted the Defendant-Appellees' Motion to Dismiss and Denied Plaintiff-Appellants' motion to amend the FAC finding that Plaintiff-Appellant had not suffered a domestic injury because his alleged injury was mainly felt in Kazakhstan. *See* A-018. The Court concluded that Appellant's alleged injuries were foreign, as the primary events—namely asset transfers and coerced share relinquishment—occurred in Kazakhstan. Id. The court further found that the use of U.S. financial systems to facilitate and conceal these actions did not establish a domestic injury. *Id.* Based on this analysis, the court held that it lacked jurisdiction under both ATS and RICO, deeming the PSAC futile and dismissing the case for lack of subject matter jurisdiction. *Id.*

Factual Allegations Contained in the Proposed Second Amended Complain

Plaintiff along with Gulnara Artambayeva and Defendants Alexander Klebanov and Sergey Kan are or were shareholders of Central Asian Power-Energy Company (hereinafter "CAPEC"), and Eximbank. *See* PSCA at ¶ 31-36, pp 2 (A-30 to 36).

Central-Asian Power Energy Company JSC was established on June 11th of 1997. *Id.* The Company consolidates the enterprises of the different economy sectors including the financial industry and electrical energy industry in Kazakhstan**.** *Id***.** In 2004, CAPEC, by means of a consortium of affiliated entities, acquired ownership of "Eximbank of Kazakhstan" JSC ("Eximbank" or the "Bank"). *Id*.

Alexander Klebanov is a Kazakh oligarch with an estimated wealth of $374 million, who chairs the Central Asian Electric Power Corporation. *See* PSAC at A-034. He and his son Yakov Klebanov are believed to serve as financial proxies for the family of former Kazakh president Nursultan Nazarbayev. *Id*. The Klebanovs are alleged to have played a role in helping Nazarbayev's family, specifically Dariga Nazarbayeva, avoid legal scrutiny,

including an unexplained wealth order. *Id*. In 2022, UK Parliament Member Dame Margaret Hodge called for sanctions against the Klebanovs, accusing them of being part of a kleptocratic elite in Kazakhstan that has enriched itself through the exploitation of the country's resources. *Id*.

Beginning from 2009 Klebanov used Eximbank to embezzle and launder and assist various top Kazakh Government officials including Massimov and Nazarbayev to launder over one hundred million dollars disguised as fictitious loans issued by Eximbank to various front corporations and offshore accounts controlled by Klebanov or his proxies to appear as legitimate transactions. *See* PSAC at A-035 to A-040.

Alexander Klebanov and his associate, Kan, run a network of nominee companies to conceal their illicit activities and facilitate large-scale criminal transactions. *See* PSAC at A- 036 to A-037. In 2001, they established Malgrey Enterprises Ltd., an offshore British Virgin Islands company used to manage CAPEC operations outside Kazakhstan. *See* PSAC at A-037, ¶ 55. Klebanov orchestrated a fraudulent scheme in 2008, presenting loans from a "Russian Associate" as legitimate, but these loans were actually bribes hidden behind fabricated transactions. *Id*. at ¶ 55. The funds were funneled through offshore entities controlled by Klebanov and his associates, including Massimov, a former Kazakh Prime Minister. *Id*. at ¶ 56. These funds were then transferred to Klebanov's

company, Lodestar, and other corrupt officials via fictitious loans issued by Eximbank and processed through New York correspondent accounts. *Id.* 56-61. This network allowed Klebanov and Kan to hide, steal, and launder large sums of money while covering their tracks with a complex web of shell companies and offshore accounts. *Id.* at 62.

In 2009 Klebanov initiated a $25 million payment to Forte Marketing under the false pretext that it was necessary for the continued operation of Eximbank and CAPEC. However, this was a ruse, designed to funnel money as a bribe to Kazakhstan's then-President Nazarbayev through his daughter, Aliya Nazarbayeva. See PSAC A-038, at ¶67.

Since Eximbank lacked sufficient liquidity, Klebanov "borrowed" funds from Russian billionaire Vasily Anisimov. *See* PSAC at A-039, ¶ 68. Between March 18 and March 26, 2009, Smeaton Co. and Farley Co., both controlled by Anisimov, transferred $33 million to Lewis Holding Ltd., a CAPEC subsidiary based in Belize. *Id.* at ¶ 68. On March 26, 2009, Lewis Holding then transferred $25 million to Forte Marketing in a direct flow of illicit funds. *Id.* at ¶ 70.

In reality these transactions were structured to evade detection, and to allow Kan, Klebanov and their associate to illegally funnel money without raising red flags. By using multiple shell companies and offshore entities, the funds were routed

through layers of transactions designed to obscure their true origin and purpose. The funds were funneled into Forte Marketing, a U.S.-based entity, which was effectively used as a nominee to shield the identities of the individuals orchestrating the scheme. This complex web of transactions, involving entities in Belize, Russia, and the U.S., was intended not only to mask the illicit nature of the payments but also to create a false veneer of legitimacy around the bribe to Kazakhstan's officials.

To cover up the fraudulent nature of this transaction, Klebanov transferred $25 million from Eximbank's working capital to his personal company, Lodestar Holdings. *Id*. at ¶71. This money was ostensibly repaid through the issuance of long-term bonds, which were packaged as loans to CAPEC-affiliated companies. *Id*. In reality, these so-called "loans" were nothing more than fictitious instruments, created solely to obscure the true nature of the transactions: the payment of a bribe. *Id*. at ¶72.

These loans were eventually classified as "non-performing loans" (NPLs) within Eximbank's portfolio, a status that would contribute to the bank's financial ruin. *Id*. Ultimately, the funds Klebanov siphoned off through these schemes played a pivotal role in the collapse of Eximbank, leading to the revocation of its license. *See* PSAC at A-040, ¶ 78 to 79.

In 2018, amid Eximbank's impending insolvency due to these fraudulent activities, Plaintiff- Appellant Amirkhanov was arrested and tortured under the direction of Klebanov and Kan. *See* A-040 to 041, ¶86.

During his detention, Plaintiff-Appellant was forced by the National Security Committee of Kazakhsan to waive all claims against any organizations, any employees of the CAPEC group of companies, "Eximbank Kazakhstan" JSC, Lodestar Holding Limited: "Mr. Amirkhanov Y.A. undertakes and guarantees that neither he, nor Eximbank Kazakhstan (or its successor), nor third parties, including, but not limited to, borrower companies and payer companies, will have claims on loans and payments made for payments in favor of Lodestar Holding Limited"… *Id.* at ¶ 110.

Moreover, the Defendant-Appellees coerced the Plaintiff-Appellant into entering into an agreement under duress, which wrongfully assigned all of Eximbank's debts and liabilities to the Plaintiff-Appellant personally. *Id.* at ¶99.

This coerced waiver stripped plaintiff-appellants of the right to bring viable causes of action under U.S. jurisdiction against Forte Marketing, LLC and others, resulting in concrete and domestic damage by precluding them from pursuing legitimate causes of action in the U.S. *See* A-045, ¶ 110.

The waiver signed by Plaintiff-Appellant Amirkhanov in 2017, which precludes him from filing any claims against organizations within the CAPEC group, including Eximbank and Lodestar Holding Limited, logically extends to Forte Marketing as well due to the interconnected nature of these entities in the broader fraudulent scheme. *See* PSAC A-047 to 049. While Forte Marketing, a U.S.-based entity, might appear separate on the surface, it was effectively used as a nominee or alter ego by Klebanov and his associates to facilitate the illicit funneling of funds, particularly in the form of bribes disguised as payments for legitimate business operations. *Id*.

In the context of Civil RICO, the waiver's breadth reflects the underlying principle that entities acting as alter egos or nominees for the same individuals or criminal enterprise are treated as part of the same web of unlawful activities. Forte Marketing, as part of this enterprise, is therefore covered under the waiver. *Id*.

SUMMARY OF THE ARGUMENT

Plaintiff-Appellant respectfully submits that the court's analysis improperly minimized key facts connecting his injuries to Forte Marketing within U.S. jurisdiction, leading to an erroneous dismissal for lack of subject matter jurisdiction. Appellant's claims of domestic injury arise from Defendant-Appellees' scheme to block him from seeking redress in the U.S. against Forte Marketing LLC, thereby

causing a concrete loss of actionable claims within U.S. borders—a domestic injury central to his RICO claim. *See* PSAC A-047 to 049. Moreover, Defendant-Appellees' use of New York-based financial systems, including correspondent accounts and the Fedwire network, to launder over $100 million, directly ties the scheme to U.S. territory. *See* PSAC A-033 to 035. This conduct resulted in measurable economic harm to Plaintiff- Appellant, with the losses materializing in the U.S., thereby confirming the existence of a domestic injury as required under RICO. Finally, Appellant's coerced waiver of legal recourse under torture, which stripped him of his ability to pursue claims against U.S. entities involved in the scheme, represents a distinct injury in U.S. jurisdiction. The court's focus on the geographical location of events overlooked the economic and legal consequences Defendant-Appellees' actions had within U.S. borders.

## STANDARD OF REVIEW

On appeal following a dismissal of a complaint for either lack of subject-matter jurisdiction under federal rule of civil procedure 12(b)(1) or failure to state a claim under rule 12(b)(6), this court reviews the district court's decision *de novo*. *See carter v. Healthport techs., LLC*, 822 f.3d 47, 56–57 (2d cir. 2016) (subject-matter jurisdiction); *krys v. Pigott*, 749 f.3d 117, 128 (2d cir. 2014) (failure to state a claim). As part of that review, this court "accepts as true all material factual

allegations of the complaint[] and draws all reasonable inferences in favor of the plaintiff." *Carter*, 822 f.3d at 56–57 (internal citations, quotation marks, and alterations omitted); *krys*, 749 f.3d at 128 (same).

Separately, the Court reviews denials of motions for leave to amend for abuse of discretion. *Kropelnicki v. Siegel*, 290 f.3d 118, 130 (2d cir. 2002). But where, as here, such denials were based on decisions of pure law, they are functionally reviewed *de novo*, as a decision premised on a legal error is necessarily an abuse of discretion. *See klein*, 906 f.3d at 226; *gelboim v. Bank of am. Corp.*, 823 f.3d 759, 769 (2d cir. 2016).

ARGUMENT

I.  YERKYN AMIRKHANOV ADEQUATELY PLEADED A DOMESTIC INJURY IN THE PROPOSED SECOND AMENDED COMPLAINT

At the pleading stage, and given the particular circumstances of this case, the alleged harm to the new york cause of action meets the domestic-injury requirement articulated by the supreme court in *Yegiazaryan v. Smagin*, 599 U.S. 533 (2023), AND RJR Nabisco Inc. v. European Community, 136 S. CT. 2090, 2106 (2016).

The principle that legislation enacted by Congress is presumed to apply only within the territorial boundaries of the United States, unless Congress has explicitly indicated otherwise, is well-established in American law. As the Supreme Court

14

articulated in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 255, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." This foundational doctrine, often referred to as the presumption against extraterritoriality, has been consistently defined by courts as a "presumption against application to conduct in the territory of another sovereign." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 119, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013) (citing *Morrison*, 561 U.S. at 265, 130 S.Ct. 2869). Put simply, "[f]oreign conduct is generally the domain of foreign law." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007) (alteration omitted).

The presumption serves to prevent international discord that may arise when U.S. laws are applied to activities in foreign jurisdictions. It also reflects the "commonsense notion that Congress generally legislates with domestic concerns in mind." *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 335–336, 136 S.Ct. 2090, 195 L.Ed.2d 476 (2016).

To address the presumption against extraterritoriality, the Supreme Court has provided a "two-step framework" for analysis. *Id.* at 337, 136 S.Ct. 2090. At step one, courts examine whether Congress has clearly and unmistakably indicated that a particular statutory provision should apply to foreign conduct. *Id.* at 335, 337, 136 S.Ct. 2090; *Kiobel*, 569 U.S. at 117, 133 S.Ct. 1659. In the absence of such an

explicit instruction, courts presume that the provision does not extend extraterritorially. If Congress does provide a clear directive, claims involving foreign conduct may proceed, subject to the statutory limitations on its extraterritorial reach. *RJR Nabisco*, 579 U.S. at 337–338, 136 S.Ct. 2090.

If a provision is determined not to have extraterritorial application, courts proceed to step two, which examines whether the case involves a permissible domestic application of the provision. This requires identifying the "focus of congressional concern" for the statutory provision in question. *Id.* at 336, 136 S.Ct. 2090. The focus refers to the "object of [the statute's] solicitude," including the conduct it seeks to regulate and the parties and interests it aims to protect. *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. —, —, 138 S.Ct. 2129, 2136, 201 L.Ed.2d 584 (2018) (alterations omitted). Courts must then determine whether the conduct relevant to the statute's focus occurred within U.S. territory. *RJR Nabisco*, 579 U.S. at 337, 136 S.Ct. 2090; *Nestlé USA, Inc. v. Doe*, 593 U.S. —, —, 141 S.Ct. 1931, 1936, 210 L.Ed.2d 207 (2021). If the relevant conduct occurred domestically, the application is permissible, even if some related activity took place abroad. *WesternGeco*, 585 U.S. at —, 138 S.Ct. at 2137.

The presumption applies to private civil RICO claims. In *RJR Nabisco*, the Court stated, "Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* at 335, 136 S.Ct. 2090

(citing *Morrison*, 561 U.S. at 255, 130 S.Ct. 2869). The Court further emphasized that § 1964(c)'s domestic injury requirement does not preclude foreign plaintiffs from bringing RICO claims, as disputes may arise regarding whether an injury is foreign or domestic. *Id.* at 353 n.12, 136 S.Ct. 2090. The extraterritorial application of Civil RICO claims hinges on the specific predicate acts alleged and whether Congress has explicitly provided for such application. In *RJR Nabisco*, the Court held that RICO's provisions, including its substantive prohibitions, apply extraterritorially only when the predicate acts themselves allow for such an application.

In the instant case, Mr. Amirkhanov alleges predicate acts under 18 U.S.C. § 201(f)(3), which criminalizes the bribery of foreign officials and explicitly permits extraterritorial application. See Proposed Second Amended Complaint at ¶ 131, pp. 30. When a Civil RICO claim is based on predicate acts like those under § 201(f)(3), the presumption against extraterritoriality is overcome. However, the plaintiff must also demonstrate that the alleged injury occurred within the United States, consistent with RICO's requirement that the plaintiff suffer a domestic injury to business or property.

The determination of domestic injury under § 1964(c) depends on whether the harm arose within the United States. In *Yegiazaryan v. Smagin*, 599 U.S. —, 143 S.Ct. 1900 (2023), the Court held that a domestic injury exists when the

circumstances surrounding the harm indicate it arose in the United States. *Id.* at 1912. For example, in *Yegiazaryan*, a California judgment constituted intangible property in California because it was where the plaintiff sought to enforce rights under that judgment. *Smagin v. Yegiazaryan*, 37 F.4th 562, 567 (9th Cir. 2022).

To succeed in RICO claims, plaintiffs must demonstrate (1) harm to a property interest recognized under state law (*Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005)), and (2) that the harm resulted in a concrete financial loss (*Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008)). Courts must carefully analyze the specific injuries alleged to determine whether they are domestic. If a plaintiff alleges multiple injuries, each must be analyzed separately. A plaintiff may recover for any injury determined to be domestic, even if other alleged injuries are foreign.

## II.    THE RIGHT TO SUE IS A COGNIZABLE INJURY TO PROPERTY

The Plaintiff-Appellant has alleged that he has suffered a domestic injury under 18 U.S.C. § 1964(c) by being compelled to assume U.S. debt created by Forte Marketing, for which he is now personally liable. *See* PSAC A-045, ¶¶99-110. Additionally, Appellant sustained financial damages without the ability to recover them from Forte Marketing, a U.S. limited liability company with significant business ties to New York. Defendant-Appellees further coerced Appellant, under duress, into signing an agreement waiving legal claims against Forte Marketing,

despite its involvement in fraudulent activities, money laundering, and bribery schemes. *Id.*

The fraudulent deprivation of Appellant's right to pursue legal claims against Forte Marketing also represents a domestic injury to a protected property interest. A chose in action, defined as a financial interest such as a debt, legal claim, or contractual right, is recognized as a form of personal property. (*Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269 (2008); *Planters' Bank v. Sharp*, 47 U.S. 301, 321 (1848)).

The U.S. Supreme Court and lower courts have consistently held that legal claims constitute property interests safeguarded by due process. (*Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *Morris v. New York City Employees' Retirement System*, 129 F. Supp. 2d 599 (S.D.N.Y. 2001)). For example, in *Hammond v. Carthage Sulphite Pulp Paper Co.*, 8 F.2d 35 (2d Cir. 1925), a breach of contract claim was recognized as a chose in action, affirming its status as personal property.

III.   THE DISTRICT COURT ERRED BY DENYING YERKYN AMIRKHANOV'S MOTION TO AMEND

The District Court denied Plaintiff-Appellant's Motion to Amend the Second Amended Complaint, finding the proposed amendment futile. *See* A-019. The

Court's determination rested on the fact that Plaintiff was in Kazakhstan at the time the shares were transferred, leading to the conclusion that Plaintiff suffered a foreign, rather than a domestic, injury. *Id*. The Court further reasoned that Plaintiff's allegations of fraudulent acts committed by Individual Defendants in the United States, aimed at concealing their scheme, did not suffice to transform the nature of Plaintiff's injury into a domestic one. *Id*.

Courts assess domestic injury under § 1964(c) using a context-specific approach. In *Yegiazaryan v. Smagin*, 599 U.S. 533, the Supreme Court determined that racketeering activity impairing the enforcement of a California judgment constituted a domestic injury, even though the judgment holder resided in Russia. Similarly, in *Bascuñán v. Elsaca*, 874 F.3d 806, the Second Circuit held that the misappropriation of tangible property located in the U.S. caused a domestic injury, irrespective of the plaintiff's foreign residency.

Defendant-Appellees' racketeering activities were conceived and executed in the U.S., using New York banking infrastructure to effectuate their schemes. In *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, the court emphasized that the location of racketeering activity, rather than the enterprise itself, is pivotal to establishing standing under RICO. Similarly, in *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 346, U.S.-based conduct was deemed an essential link in the causal chain, supporting jurisdiction.

Courts employ a comprehensive analysis to assess subject matter jurisdiction. In *Tabor v. Bodisen Biotech, Inc.*, 581 F. Supp. 2d 552, the court highlighted the importance of evaluating all relevant factors collectively.

The injury arising from the alleged racketeering activity—namely, the fraudulent deprivation of Appellant's right to pursue legal claims in an American court, which can only be enforced in the United States against assets or individuals located in New York—is inherently domestic in nature and cannot be characterized as foreign.

Under Civil RICO, the concept of enterprise liability treats entities acting as part of the same criminal enterprise, or as alter egos, as functionally indistinguishable. See United States v. Mazzei**,** 700 F.2d 85, 89–90 (2d Cir. 1983); *see also City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425, 447 (2d Cir. 2008)( The Second Circuit recognized the concept of enterprise liability, particularly where multiple entities are interwoven in a coordinated scheme to evade legal obligations or perpetrate fraud).

The interrelated nature of the companies within this network, including CAPEC, Eximbank, Forte Marketing, and Lodestar, supports the conclusion that the waiver was designed to bar claims against all entities within the web of unlawful activities orchestrated by Klebanov and his associates. Thus, the waiver logically applies to Forte Marketing as part of this broader criminal enterprise, preventing any claims against it in the same manner as it applies to the other entities involved.

The District Court erred in denying Plaintiff-Appellant's Motion to Amend the Second Amended Complaint, as the proposed amendment would not be futile. Contrary to the Court's finding, Plaintiff-Appellant's injury arises from racketeering activity perpetrated by Defendant-Appellees in the United States, not merely from the Plaintiff's residence in Kazakhstan. The fraudulent deprivation of Plaintiff's right to pursue legal claims in an American court, a right that can only be enforced in the U.S. against assets or individuals in New York, constitutes a domestic injury. This injury is distinguishable from foreign harm, as it directly relates to conduct occurring within the U.S. and the resulting impairment of Plaintiff's ability to assert claims in the American legal system.

Further, the context-specific approach to domestic injury, as recognized in *Yegiazaryan v. Smagin* and *Bascuñán v. Elsaca*, supports the conclusion that a domestic injury exists in this case. Defendant-Appellees' racketeering activities, which were conceived, executed, and facilitated within the U.S. using New York-based infrastructure, are at the heart of the injury Plaintiff-Appellant has suffered. As established in Dennis v. JPMorgan Chase & Co. and In re Alstom SA Securities Litigation, the location of the racketeering activity and its nexus to U.S. law and jurisdiction is the crucial factor for determining whether the injury is domestic.

Finally, the concept of enterprise liability under Civil RICO underscores that the various entities involved—CAPEC, Eximbank, Forte Marketing, and Lodestar—

should be treated as part of the same criminal enterprise. The waiver barring claims against these entities, including Forte Marketing, is consistent with the understanding that entities operating within a coordinated illegal scheme are functionally indistinguishable. The interrelated nature of these companies supports the conclusion that the waiver logically applies to Forte Marketing, preventing claims against it in the same manner as it applies to the other entities involved in this broader criminal enterprise.

Thus, Plaintiff-Appellant should be permitted to amend the complaint to reflect these domestic injuries and the coordinated activities of the Defendant-Appellees, as the proposed amendment is neither futile nor unsupported by law.

IV.    THE PLAINTIFF-APPELLANT ALLEGED A DOMESTIC INJURY RESULTED IN CONCRETE FINANCIAL LOSS

The Appellant's injury is both concrete and directly tied to U.S. conduct because Forte Marketing, operating within the United States, acted as an intermediary in transferring $25,000,000. The funds, funneled through various nominees and ultimately reaching Forte Marketing's accounts, were then moved offshore to entities controlled by Klebanov. This movement of funds through U.S. banking systems, in violation of U.S. law, resulted in a direct financial injury on U.S. soil,

impacting U.S. financial institutions and reinforcing the harm suffered within the United States.

Moreover, the U.S. Supreme Court's decision in *Walden v. Fiore*, 571 U.S. 277 (2014), underscores the requirement for a defendant's actions to have a substantial connection to the forum state to establish jurisdiction. In this case, Forte Marketing's conduct—processing and transferring funds through its U.S. accounts—directly led to financial harm within the United States. The Appellant was forced to assume responsibility for the debt arising from the fraudulent transactions, a debt directly linked to Forte Marketing's U.S.-based activities. This constitutes a concrete financial loss occurring within the U.S., fulfilling the jurisdictional and financial loss requirements for a claim under U.S. law.

In conclusion, the financial harm suffered by the Appellant is directly tied to fraudulent transfers that occurred through U.S. banking systems, resulting in substantial financial injury within the United States. The U.S. Supreme Court's rulings on domestic injury and substantial connections support the Appellant's claim for damages arising from Forte Marketing's involvement in these fraudulent transactions.

CONCLUSION

In conclusion, the Appellant, Yerkin Amirkhanov, has sufficiently demonstrated a domestic injury that aligns with the requirements for a Civil RICO claim. The

fraudulent transactions orchestrated by the Defendant-Appellees, involving the illicit transfer of $25 million through a U.S.-based entity, Forte Marketing, and the subsequent coercion that forced the Appellant to assume responsibility for the resulting debt, establish a clear domestic nexus. The Appellant's injury, tied to the fraudulent conduct occurring within U.S. territory and the wrongful coercion involving a U.S. company, satisfies the domestic injury requirement under RICO. As the Supreme Court has emphasized, the focus of congressional concern for RICO includes the protection of U.S. property interests, and here, the Appellant's injury is directly related to the use of U.S. banking facilities and the conduct of U.S.-based entities. Therefore, the Appellant has properly alleged a domestic injury and, under the legal framework established by the Supreme Court, is entitled to pursue his Civil RICO claims in the United States.

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit, Typeface Requirements and Type-Style Requirements.

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 6,019 words.

2. This document complies with the typeface requirements of Fed. S. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word (2019/Office) in 14-point font, Times New Roman.

Dated: December 30, 2024

By: */s/ Irina Shpigel, Esq.*
IRINA SHPIGEL
SHPIGEL LAW P.C.
*Attorneys for Plaintiff-Appellant*
1599 East 15th Street, 5th Floor
Brooklyn, New York 11230
(212) 390-1913
ishpigel@iselaw.com